UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
KENNY WATSON,

Plaintiff,

- against -

CORRECTIONS OFFICER ADAM MAYO,

Defendant.
----------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/26/08

**MEMORANDUM AND ORDER**

07 Civ. 54 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff Kenny Watson brings this suit under 42 U.S.C. § 1983 seeking damages for an assault that he allegedly suffered on January 5, 2004, while he was incarcerated at the Ossining Correctional Facility in Ossining, New York.[1]

Plaintiff has previously proceeded to a jury trial on these same claims against three other corrections officers who were involved in the incident, and lost. Watson v. Delgado et. al., 05 Civ. 6071 (SAS)(AJP)(S.D.N.Y. 2005). In fact, Corrections Officer Adam Mayo was named in the prior complaint, but was dismissed therefrom without prejudice for lack of timely service. However, only two weeks after Mayo was dismissed, plaintiff served Mayo with a copy of the summons and complaint. Nevertheless, plaintiff made no effort to re-join Mayo in the action, or even bring the service

---

[1] Plaintiff was an inmate at the Ossining Correctional Facility from January through March of 2004. See Watson v. Delgado et al., 2006 WL 1716869 at * 1 (S.D.N.Y. June 20, 2006)(SAS)(Order denying defendants' motion for summary judgment).

success to the Court's attention and ask for reconsideration of the dismissal. Instead, ten months later, the case went to trial against the other three corrections officers. At trial, Mayo testified on behalf of the defendants, and was cross-examined by plaintiff's counsel. After the close of evidence, the jury found in favor of the defendants. Three months after that trial, and exactly one day before the expiration of the statute of limitations, plaintiff filed the instant suit against Mayo.

Mayo now moves to dismiss the instant suit pursuant to Fed. R. Civ. P. 12(c) on the basis of laches. As explained more fully below, we believe that plaintiff should not be allowed a second opportunity to bring the same claims here against a defendant who had been named in the original complaint in a prior case and was eventually served well before trial in that case began. The only conceivable explanations for plaintiff's failure to join Mayo in the earlier action either raise issues of competence on the part of plaintiff's counsel or efforts of tactical gamesmanship to reserve the proverbial second bite at the apple before a different judge and jury. Neither explanation merits allowing this second, duplicative suit to proceed. Accordingly, we grant defendant's motion to dismiss.

## BACKGROUND

At about 12:35 p.m. on January 5, 2004, Watson was let out of his cell in Gallery 3 of the Special Housing Unit ("SHU") at the Ossining Correctional Facility for a shower.[2] On his way to pick up a razor, he was ordered to return to his cell to lock back in, apparently because he had refused a shower earlier that day, and was not entitled to have a second opportunity to shower.[3] Watson alleges that he returned the razor, and then as he was walking back to his cell Officer Mayo struck him with a baton and assaulted him.[4]

Mayo's version of the events, memorialized the same day in a Use of Force report, is quite different.[5] According to Mayo, Watson refused to comply with the order to return to his cell. Watson then became "extremely agitated," and took a swing at Mayo with a closed right first. Mayo then pulled Watson down to the floor, and struck him with a baton. Watson continued to resist and disobey orders, and it took three other Corrections Officers - Alfonso Orrico, Enrique Delgado, Manuel Moscoso - to hold Watson down and apply mechanical restraints.

---

[2] Complaint ¶¶ 9-12.

[3] See Declaration of Andrew F. Plasse, Esq., Ex. 1, (Transcript of Tier III Prison Disciplinary Hearing).

[4] Complaint ¶¶ 13-14.

[5] See Declaration of Susan Odessky, Ex. B (Memoranda From Officers Mayo, Delgado, Orrico and Moscoso dated January 5, 2004); Defendant's Reply Memorandum of Law at 4-5.

Watson filed five grievances against the various officers involved in the January 5, 2004 incident, which were all denied.[6] Having exhausted his administrative remedies, on June 30, 2005 Watson then filed a § 1983 complaint in this Court against all four corrections officers involved in the incident. Watson v. Delgado et. al., 05 Civ. 6071 (SAS)(S.D.N.Y. 2005). The complaint alleged that all four officers assaulted him while he was returning to his cell.[7]

On July 22, 2005, Judge Shira Scheindlin referred the case to Magistrate Judge Andrew Peck for "General Pretrial."[8] Over the next few months, plaintiff served three of the defendants – Orrico, Delgado, and Moscoso – but failed to serve Mayo. The reasons for the failure to serve are unclear, and are disputed here. Andrew F. Plasse, Esq., Watson's attorney in the first action as well as here, sent Mayo a waiver of service form, which was never

---

[6] The five grievances following this incident were SS-38472-04, SS-38473-04, SS-38477-04, SS-38505-04, and SS-38622-04. All five were denied, and the Court in the prior action found that Watson had exhausted his administrative remedies. See Watson v. Delgado et al., 2006 WL 1716869 at * 7 (S.D.N.Y. June 20, 2006)(SAS)(Order denying defendants' motion for summary judgment).

[7] In the prior case, Watson alleged that he was "grabbed from behind and thrown into a wall, then onto the floor," "felt a sharp stick in his leg," and was handcuffed. As a result of the alleged assault, Watson claimed that he had suffered "a laceration to his left leg requiring sutures," a "swollen" face, a laceration on his lip, and an injury to his left wrist, for which he received "ongoing medical treatment" and physical therapy. See Watson v. Delgado et al., 2006 WL 1716869 at * 1 (S.D.N.Y. June 20, 2006)(SAS)(Order denying defendants' motion for summary judgment)(citations omitted).

[8] See Watson v. Delgado et. al., 05 cv 6071 (SAS)(filed July 22, 2005)(Order referring the case to a Magistrate Judge).

-4-

executed.[9] Plasse then dispatched a process server to serve Mayo in person on two separate occasions, first at Ossining Correctional Facility and then at Great Meadow Correctional Facility, where Mayo had been transferred.[10] Both facilities refused to accept service on Mayo's behalf. Mayo argues that the refusals were made in good faith, because Mayo no longer worked at the first facility, and because plaintiff was mistaken as to Mayo's first name, believing it to be "John" and not, as it actually was, Adam.[11] Plaintiff, on the other hand, alleges that Mayo actively avoided service, at least on the second occasion, since Plasse's process server had Mayo's name correctly listed as "Adam" when he tried to serve Mayo at Great Meadow Correctional Facility.[12]

Whatever the reason for the failure, plaintiff failed to timely serve Mayo within 120 days of filing the complaint, as required by Fed. R. Civ. P. 4(m). Accordingly, at a pre-trial status conference on November 21, 2005, Magistrate Judge Peck sua sponte dismissed Mayo without prejudice from the action.[13]

---

[9] Plasse Decl., Ex. 5.

[10] Plaintiff's process server timely filed an affidavit of due diligence after each failed attempt. See Plasse Decl., Exs. 6,9.

[11] Defendant's Reply Memorandum of Law at 5.

[12] Plaintiff's Memorandum of Law at 5; Plasse Decl. Ex. 8.

[13] See Plasse Decl. Ex. 12 (Transcript of proceedings before Magistrate Judge Peck, dated November 21, 2005, 4:15-17, ("So it would be, in the case . . hold the Mayo. I couldn't resist.")).

Just two and a half weeks later, on December 9, 2005, plaintiff succeeded in serving Mayo at Great Meadow Correctional Facility.[14] However, plaintiff did not alert the Court to the fact that service had been made, nor did plaintiff in any way seek to join Mayo in the ongoing action.[15]

The case against the other three officers proceeded, and ten months later, following the denial of defendants' summary judgment motion, went to trial. The trial commenced before Magistrate Judge Peck and a jury on October 16, 2006. During the trial, Mayo testified in person as a witness for the defendants, and was cross-examined by Plasse, plaintiff's attorney. Mayo admitted that of the officers involved in restraining Watson, he was the one who struck Watson with a baton.[16] Mayo's testimony in this regard was consistent with the Use of Force report issued on the date of the incident, which noted that Mayo had been the only officer to deploy a baton.[17] On October 19, 2006 the jury returned a verdict in favor of the defendants.

On January 4, 2007, three months after the verdict in the prior action, and exactly one day before the expiration of the

---

[14] Plasse Decl. Ex. 11.

[15] See, e.g., Defendant's Reply Memorandum of Law at 6.

[16] Plaintiff's Memorandum of Law at 4.

[17] See supra n.5.

-6-

three year statute of limitations,[18] plaintiff filed the instant complaint against Mayo.[19]

## DISCUSSION

We begin our analysis of whether the defendant is correct that this complaint must be dismissed on laches or some other ground with the observation that plaintiff could not at the outset have sued Corrections Officer Mayo in one lawsuit and his three fellow corrections officers in another lawsuit, as that would constitute an impermissible splitting of a cause of action. See Curtis v. Citibank, N.A., 226 F.3d 133, 138 (2d Cir. 2000)("As part of its general power to administer its docket, a district court may stay or dismiss a suit that is duplicative of another federal court suit")(citing Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976)).[20]

The reasons for the rule against splitting a cause of action are obvious: splitting a cause of action provides a plaintiff with

---

[18] See, e.g., Eagleston v. Guido, 41 F.3d 865, 871 (2d Cir. 1994)(New York state law supplies the applicable three year statute of limitations for suits under 42 U.S.C. § 1983).

[19] We note further that Mayo was not served in the instant case until March 2007, two more months after the complaint was filed, and thirty-eight months from the date of the original incident.

[20] Technically, the test for dismissal of a duplicative lawsuit is whether, if the first suit were final, claim preclusion would apply. As the Supreme Court stated over 100 years ago in United States v. The Haytian Republic, 154 U.S. 118, 124 (1894), "[T]he true test of the sufficiency of a plea of 'other suit pending' in another forum [i]s the legal efficacy of the first suit, when finally disposed of, as 'the thing adjudged,' regarding the matters at issue in the second suit."

the proverbial two bites at the apple; creates a myriad of possible prejudices to the defendant; creates genuine possibilities of inconsistent results; and imposes an unwarranted burden on courts and jurors. As the Second Circuit has put it, "The power to dismiss a duplicative lawsuit is meant to foster judicial economy and the comprehensive disposition of litigation, . . . to protect parties from the vexation of concurrent litigation over the same subject matter, . . . [and to] foster[] judicial economy and protect[] the parties from vexatious and expensive litigation." Curtis, 226 F.3d at 138 (citations omitted). See also Green v. Wolf Corp., 406 F.2d 291, 297 (2d Cir. 1968)("Early in the development of our civil procedures it became apparent that judicial efficiency demanded the elimination of multiple suits arising from the same facts and questions of law.").

Although in its most common form the rule against splitting a cause of action applies when a plaintiff has sued the same defendant in two separate suits, see, e.g., Curtis, 226 F.3d at 139 ("plaintiffs have no right to maintain two actions on the same subject in the same court, against the same defendant at the same time"), the rule applies with equal force to different defendants when there is identity of interest with prior defendants and adequate representation. Alpert's Newspaper Delivery, Inc. v. The New York Times Co., 876 F.2d 266, 270 (2d Cir. 1989). The rule would have applied had Watson initially attempted to sue Mayo and

-8-

the other three officers separately because all the officers were alleged to have been involved in the exact same incident, and their interests were sufficiently aligned such that they may have been in privity with each other. See Barclay v. Lowe, 131 Fed.Appx. 778, 779, (2d Cir. 2005)(upholding a district court's dismissal of a second suit against prison guards as duplicative although the second suit named different individual guards because all defendants in both suits were prison guards at Attica and the interests of the second set of defendants were adequately represented by those in the first suit). See also Curtis, 226 F.3d at 139 ("[T]he complex problems that can arise from multiple federal filings do not lend themselves to a rigid test, but require instead that the district court consider the equities of the situation when exercising its discretion.").

In this context, Mayo now moves to dismiss this second suit on the grounds of laches, to which plaintiff responds that laches is inapplicable in a § 1983 case that seeks only damages and no equitable relief. We have no quarrel with that response if the issue here were simply Watson's delay in filing the instant suit against Mayo. Indeed, that is the fact pattern of the main authority on which plaintiff relies, Ivani Contracting Corp. v. City of New York, 103 F.3d 257, 260 (2d Cir. 1997) cert. den'd 520 U.S. 1211 (1997). However, the doctrine of laches does not just

implicate time periods, and should be applied here because of plaintiff's vexatious and inequitable litigation tactics.

Beyond the question of laches, in the alternative we find that this second suit is barred by the doctrine of claim preclusion.

## A. Laches

### 1. Applicable Law

Traditionally, the doctrine of laches bars suits where (1) the plaintiff knew of the defendant's alleged misconduct, (2) plaintiff inexcusably delayed in taking action, and (3) the defendant was prejudiced thereby. See, e.g., Costello v. United States, 365 U.S. 265 (1961); Air Cargo News, Inc. v. Tabmag Publishing, Ltd., 07 Civ. 480(DI), 2007 U.S. Dist. LEXIS 36873, at *33 (E.D.N.Y. Apri. 11, 2007).

The word "laches" traces its origin back to the Latin word "laxus" which means "lax," and it is thought that the doctrine has its roots in Roman law.[21] The doctrine entered American law through England, where the doctrine applied in equity, and was invoked by the Chancellor in Equity to withhold relief when a plaintiff's delay in coming to Equity was inordinate, and the delay had caused prejudice to the defendant. See Henry L. McClintock, Handbook of the Principles of Equity § 28 (2d ed. 1948); Ashraf Ray Ibrahim,

---

[21] Visdean R. Vass & Xia Chen, The Admiralty Doctrine of Laches, 53 La. L. Rev. 495, 497 (1992).

-10-

Note, The Doctrine of Laches in International Law, 83 Va. L. Rev. 647, 647 (1997); Thomas G. Robinson, Note, Laches in Federal Substantive Law: Relation to Statutes of Limitation, 56 B.U. L. Rev. 970 (1976).

Since the doctrine of laches pre-dated the enactment by legislatures of statutory time limits,[22] the Second Circuit has held that laches can not be used in lieu of legislatively prescribed limitations periods: "The prevailing rule, then, is that when a plaintiff brings a federal statutory claim seeking legal relief, laches cannot bar that claim, at least where the statute contains an express limitations period within which the action is timely." Ivani Contracting, 103 F.3d at 260. The Second Circuit grounded this rule on separation of powers principles, on the theory that federal courts should not infringe on the legislature's determination of when a claim becomes stale. 103 F.3d at 260 ("An express limitations period reflects a legislative value judgment striking the appropriate balance between the interests promoted by the statute and countervailing interests of repose.").

Ivani Contracting involved a § 1983 claim brought by a private contractor who believed that it had been wrongly denied two New York City contracts to build sewers in Queens. Although the contractor's suit was timely within the three year statute of

---

[22] As the Second Circuit noted, statutory enactments of time limits began in earnest in 1624 with the statute of 21 James I, ch. 16. Ivani Contracting, 103 F.3d at 259.

limitations, the district court dismissed the suit on laches grounds because the contractor had not filed its complaint until the construction projects themselves were almost entirely completed by other contractors. The district court noted that the contractor should have initiated Article 78 proceedings in New York State court or brought an action to stop the construction before it began, for a decision against the City at a later juncture would force the City to pay twice, once for the completion of the projects and once for damages. On appeal, the Second Circuit reversed, holding that laches could not cut short a statutory limitations period.

Yet, historically, the doctrine of laches has encompassed broader equitable concerns beyond simply waiting too long to file suit. Originally in the Court of Chancery, and also subsequently in this country, laches has been invoked in the face of litigation abuse or changed relationships between parties that may have nothing to do with the amount of time that has passed since the claim arose. As one law review article notes, "[T]he doctrinal underpinnings of the laches principle are not based upon extrajudicially prescribed time limits, but instead upon a rich history of justice, fairness, and the equitable balancing of rights." Ibrahim, The Doctrine of Laches in International Law, 83 Va. L. Rev. at 647.

A prime example is a United States Supreme Court case from 1892, Galliher v. Cadwell, 145 U.S. 368 (1892).[23] In Galliher, the Court invoked laches to bar a widow's claim to homestead lands that had been entered on by her husband prior to the current occupant.[24] Without reaching the question of whether the widow's claims to the land were timely within the statutory period, the Court found that it would be unfair to allow the widow to assert her claim to the lands at the time of suit, given that the value of land in question had exploded in the interim since her husband had entered the property.[25] The Court stressed that laches was appropriate not because of the amount of time the widow had waited, but because of the fundamental change in the value of the land: "[T]he question of laches turns not simply upon the number of years which have elapsed between the accruing of her rights, whatever they were, and her assertion of them, but also upon the nature and evidence of those rights, the changes in value, and other circumstances occurring during that lapse of years." Id. at 371-72. The Court stressed

---

[23] It is thought that the doctrine of laches first entered American law in an 1815 opinion by Justice Story. See Brown v. Jones, 4 F. Cas. 404, 406 (C.C.D. Mass. 1815) (No. 2017).

[24] The Court also noted that it could have rested its decision on any of the numerous statutory grounds which had been presented for review, but held that laches superceded the statutory claims: "The laches of the appellant is such as to defeat any rights which she might have had, even if these prior questions were determined in her favor." 145 U.S. at 371.

[25] The land in question was located in Tacoma, Washington, which in the 1880 census had a population of 1,098, but by the 1890 census had a population of over 36,000. It is fair to assume that the value of the land was roughly proportional to the demand.

-13-

that laches was more than equity's equivalent of a statutory limit: "Laches is not, like limitation, a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced - an inequity founded upon some change in the condition or relations of the property or the parties." Id. at 373.

The difference between Galliher and Ivani Contracting is instructive. Whereas in Ivani Contracting, the plaintiff's delay had been the source of prejudice to the defendant, in Galliher the Court applied laches to prevent the widow from using her legal rights to gain an unfair and undeserved advantage.

This broader conception of laches survived into twentieth century American law, even after the merger of law and equity in 1935. See Henry L. McClintock, Handbook of the Principles of Equity § 28 (2d ed. 1948)(stating that in applying laches, American courts have generally considered: (1) unreasonable delay; (2) prejudice to the defendant; (3) potential loss of evidence; and (4) change in the value of the subject-matter involved).

For example, in 1938 the Supreme Court of Michigan noted that laches was available in actions at law even when the statutory period had not run. Kipp v. Van Wagoner, 286 Mich. 202, 207-08, 281 N.W. 592, 594-95 (Mich. 1938)("laches . . . bar[s] the assertion of such right later under changed conditions, even though the statute of limitations has not run.")(citing Olson v. Williams, 185 Mich. 294, 301, 151 N.W. 1043 (1915).

In 2002, the Seventh Circuit applied laches to bar a federal statutory claim brought by Indianapolis, Indiana firefighters under the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301 ("USERRA"). Miller v. City of Indianapolis, 281 F.3d 648, 653 (7th Cir. 2002). The Seventh Circuit did not address what statute of limitations applied to the firefighters' claims, but held that laches barred the claims because of plaintiffs' unexplained delay and the resulting prejudice to the defendants. The Seventh Circuit cited Galliher, and explained that "Laches is based not on simply the passage of time, as is a statute of limitations, but rather upon changes of conditions or relationships."

As recently as 2005 the United States Supreme Court cited its Galliher holding with approval in City of Sherrill, N.Y. v. Oneida Indian Nation of New York, 544 U.S. 197, 217 (2005) for the proposition that "Laches is not . . . a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced - an inequity founded upon some change in the condition or relations of the property or the parties." 544 U.S. at 217.

Thus, laches does not necessarily infringe on legislative prerogatives as to the timeliness of a suit, because laches is more than mere delay. The doctrine has a rich history of equitable considerations as to the relationship between the parties, or the equities of a given case.

-15-

Further, for the sake of completeness, we note that even as regards a narrower, mere delay conception of laches, the Second Circuit's rule in Ivani Contracting appears to be unique among the federal circuits. Some circuits have affirmed the use of laches within a statutory limitations period. See A.C. Aukerman Co. v. R.L. Chaides Construction Co., 960 F.2d 1020, 1029-30 (Fed.Cir. 1992)(en banc); Teamsters & Employers Welfare Trust of Illinois v. Gorman Bros. Ready Mix, 283 F.3d 877 (7th Cir. 2002)(Posner, J.). Other circuits have invoked a presumption against the use of laches to shorten a statute of limitations, but have not made the presumption conclusive. See Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc., 270 F.3d 298, 321 (6th Cir. 2001); United States v. Rodriguez Aguirre, 264 F.3d 1195, 1207-08 (10th Cir. 2001); Lyons Partnership v. Morris Costumes, Inc., 243 F.3d 789, 799 (4th Cir. 2001).

Indeed, in the most recent circuit decision on point, Judge Posner, writing for a Seventh Circuit panel in Teamsters & Employers Welfare Trust, held that the doctrine of laches is available in suits at law because it is the functional equivalent of the doctrine of equitable tolling (in reverse). See also Hot Wax, Inc. v. Turtle Wax, Inc., 191 F.3d 813, 822 (7th Cir. 1999). Judge Posner specifically criticized Ivani Contracting's rationale that a separation of powers issue arose when federal judges cut short a limitations period for § 1983 suits because the statute of

-16-

limitations for § 1983 suits is borrowed from state law in the first place. According to Judge Posner, laches does not interfere with federal legislative prerogatives because the borrowing of state statutes of limitations is fundamentally different from Congressional enactment of a statute of limitations: "[w]hen Congress fails to enact a statute of limitations, a court that borrows a state statute of limitations but permits it to be abridged by the doctrine of laches is not invading congressional prerogatives." Teamsters & Employers Welfare Trust, 283 F.3d at 881.

## 2. **Watson's Failure to Join Mayo in the Prior Action**

Here, plaintiff's failure to join Mayo in the prior action after Mayo had in fact been served with a summons and complaint is inexcusable. This is true no matter whether the failure was professional negligence, or, worse, a deliberate tactic to get a second bite at the apple before a different judge and jury.

Accordingly, all three elements of laches defense are present. First, the plaintiff clearly knew of the defendant's alleged misconduct - Mayo was named in the prior complaint and then properly served at least ten months prior to the start of trial. Second, plaintiff inexcusably delayed in taking action. By not asking Magistrate Judge Peck to reconsider the dismissal of Mayo or in any other way seeking to join Mayo in the ongoing litigation,

but instead bringing a separate suit, plaintiff's counsel split his cause of action. Third, the defendant has been prejudiced by these tactics. This second suit will impose real costs not only on Mayo, but also on the resources of this Court. Defendant Mayo will be prejudiced by the excessive gap between the incident and a second trial and having to stand before a jury alone, although it is clear that there were other officers involved in the incident. The public interest will also be harmed, as such duplicative litigation strains the resources of the federal judiciary, and imposes a burden on taxpayers who supported the Attorney General's office who will need to defend this case a second time.

Further, applying laches in this context presents no separation of powers issues, as our ruling concerns plaintiff's failure to join Mayo in the earlier action, not plaintiff's delay in bringing the second suit. We do not implicate the time within which a plaintiff must file suit, but his manner of doing so. Our application of laches, in this context, far from infringing on legislative prerogative, falls within the peculiar province of the judiciary, since courts retain inherent authority to regulate their own docket. <u>See, e.g.</u>, <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 44-45 (1991).

Finally, we deny plaintiff's argument that laches is inapplicable here because defendant Mayo has unclean hands. <u>See, e.g.</u>, <u>PenneCom B.V. v. Merrill Lynch & Co., Inc.</u>, 372 F.3d 488, 493

2d Cir. 2004)(unclean hands defeats the affirmative defense of laches). First, given that Mayo reported on the Use of Force memo that he deployed his baton against plaintiff, there is no colorable argument that Mayo attempted to mislead the plaintiff into thinking that any of the other officers deployed their batons. Second, there is no direct evidence of any kind that Mayo actively avoided service. Finally, regardless of any dispute about plaintiff's effort to serve Mayo, the fact remains that he was served a full ten months before trial.

## B. Claim Preclusion

In the alternative, we dismiss Watson's complaint on the grounds of claim preclusion.

Under the doctrine of claim preclusion, or res judicata as it is sometimes called, "[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. " St. Pierre v. Dyer, 208 F.3d 394, 399 (2d Cir. 2000) (quoting Federated Dept. Stores, Inc. v. Moitie, 452 U.S. 394, 398, (1981)); see also Legnani v. Alitalia Linee Aeree Italiane, S.p.A., 400 F.3d 139, 141 (2d Cir. 2005) (" '[T]he first judgment will preclude a second suit only when it involves the same 'transaction' or connected series of transactions as the earlier suit . . . .' " (quoting Maharaj v. Bankamerica Corp., 128 F.3d 94, 97 (2d Cir. 1997))).

The facts alleged in Watson's first complaint are identical to those in his second complaint. Thus, the claims clearly arise from the same common nucleus of operative fact, and the only question relevant to the preclusion analysis is whether Mayo was "in privity" with the defendants in the prior action.

Traditionally, the doctrine of privity applied only to a narrow class of relationships between defendants in which a latter-sued defendant is "so identified in interest with a party to a former litigation that he represents precisely the same right in respect to the subject matter involved." Kourtis v. Cameron, 419 F.3d 989, 996 (9th Cir. 2005). However, the modern doctrine of privity has been expanded significantly, such that privity will be found whenever a party's "interests were adequately represented by another vested with the authority of representation." Alpert's Newspaper Delivery, Inc. v. The New York Times Co., 876 F.2d 266, 270 (2d Cir. 1989). See also Northern Assurance Co. of America v. Square D Co., 201 F.3d 84, 89 (2d Cir. 2000)(noting that "courts have expanded the concept of privity beyond its literal meaning"). Another Second Circuit decision has suggested that the test for privity is whether a subsequent defendant's relationship to an earlier defendant was "sufficiently close" to justify preclusion. Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A., 56 F.3d 359, 367-68 (2d Cir. 1995)("[P]rivity bars relitigation of the same cause of action against a new defendant known by a plaintiff

at the time of the first suit where the new defendant has a sufficiently close relationship to the original defendant to justify preclusion.").

Courts have routinely found privity between co-employees sued in separate suits over allegedly tortious acts that occurred during the course of their employment. See, e.g., Adams v. California Dep't, of Health Services, 487 F.3d 684, 691 (9th Cir. 2007)(holding that co-employees of a state agency as well as independent contractors hired by the state agency were in privity with the state agency itself and various other individual defendants who had been sued in a prior action). Indeed, almost directly on point, the Second Circuit has held certain prison guards to be in privity with other prison guards in the context of a § 1983 complaint brought by a prison inmate. Barclay v. Lowe, 131 Fed.Appx. 778, 779, (2d Cir. 2005). In Barclay, the Second Circuit affirmed a district court's dismissal of a prisoner's duplicative lawsuit even though the prisoner's second suit named different prison guards as defendants: "Although [the plaintiff] named different defendants in the second suit than in the first, the suits are nonetheless duplicative because the defendants in the second suit are in privity with the defendants in the first suit. All defendants are employees of Attica and their interests are adequately represented by those in the first suit who are 'vested

with the authority of representation.'"   131 Fed.Appx at 779

(citing Alpert's Newspaper Delivery, 876 F.2d at 270).

We believe that the same analysis applies here.   The three corrections officers in the first suit had identical interests with Mayo, so much so that he participated in the trial as a witness on their behalf.   See Kourtis, 419 F.3d at 996 (citing as additional factors in privity analysis "a close relationship, substantial participation [in the prior suit], and tactical maneuvering.")   See also Adams, 487 F.3d at 691 (finding privity between co-employees in part because the new defendants had submitted declarations regarding their participation in the alleged  cause of action).

Further, in testifying on their behalf, Mayo did not distance his interest from theirs by overstating his role so as to deflect liability away from them and onto himself.   From the Use of Force Report issued back on the date of the incident in question it was unquestionably clear that Mayo was the only officer to deploy his baton.   His testimony at the trial was not inconsistent therewith.

Accordingly, Mayo is in privity with the officers sued in the prior action, and the doctrine of claim preclusion bars Watson's suit against Mayo.

## CONCLUSION

Under the particular circumstances here the doctrine of laches precludes the plaintiff from proceeding on a split cause of action,

and pursuing a second claim against Mayo when Mayo had been named in the original complaint and then eventually served in that action. Alternatively, the doctrine of claim preclusion bars this action. Accordingly, defendant's motion is granted and plaintiff's complaint is dismissed with prejudice. The Clerk of the Court is directed to close the case.

**SO ORDERED.**

Dated:     New York, New York
           February 26, 2008

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Copies of the foregoing Order have been mailed on this date to the following:

Andrew F. Plasse, Esq.
352 Seventh Avenue, Suite 402
New York, NY 10001

Susan H. Odessky, Esq.
Office of the Attorney General
State of New York
120 Broadway
New York, NY 10271